John H. REDDING, Plaintiff
and Appellant,

v.

T. Harold JACOBSEN, et al., Defendants
and Respondents.

No. 17222.

Supreme Court of Utah.

Oct. 16, 1981.

John Preston Creer, Brent D. Ward, David F. Evans, Salt Lake City, for plaintiff and appellant.

Frank V. Nelson, Brinton R. Burbidge, Thomas C. Anderson, Salt Lake City, for defendants and respondents.

OAKS, Justice:

This is a suit by the former editor of a college newspaper against the president of his college, the Utah State Board of Regents, and the State Archivist, for a declaratory judgment and an injunction to compel them to release personally identifiable gross salary information for all employees of the Utah State System of Higher Education. The disclosure of personally identifiable sal-

ary information is forbidden by the Publication of Higher Education Salary Data Act of 1979, codified in Utah Code Annotated, 1953, § 53–48a–1, *et seq.* In granting defendants' motion for summary judgment, the district court rejected plaintiff's contention that this Act was unconstitutional, and plaintiff took this appeal.

## I. THE DECISION IN REDDING I

This controversy began in 1978, when ¡·laintiff, then editor of the student newspaper at Weber State College, obtained an order from the district court compelling disclosure of the gross salaries and wages of all employees of the college. That order, based on the statutory law in effect at the time it was entered, was affirmed by this Court in what the Court explicitly declared to be a decision based "on the record as presented to the district court, and on the basis of our statutory law." *Redding v. Brady,* Utah, 606 P.2d 1193, 1197, n. 12 (1980) (hereafter, *Redding I*). Pursuant to the Utah Information Practices Act of 1975, U.C.A., 1953, § 63–50–1, *et seq.,* the appropriate state administrative agency had classified salaries paid employees of state agencies and institutions as "public data." This classification brought public salaries within the terms of the Public and Private Writings Act, § 78–26–2, which, as interpreted by this Court, made public writings available for inspection and copying by any citizen, unless otherwise expressly provided by statute. *Deputy Sheriffs Mutual Aid Association v. Salt Lake County Deputy Sheriffs Merit System Commission,* 24 Utah 2d 110, 466 P.2d 836 (1970). Finding no statutory or constitutional provision to the contrary, this Court held in *Redding I* that the Utah statutes in effect at the time the district court acted required defendants to disclose the salary data sought by plaintiff.

Two constitutional rights were argued in the briefs in *Redding I.* In addition to his successful argument for a statutory right of disclosure, plaintiff also argued that the Utah State Constitution provisions on free speech and free press (Art. I, § 15) established a public right of access to informa-

tion regarding the gross salaries paid to public employees. No judicial precedents were cited in support of this asserted right, and plaintiff's brief made no mention of the federal Constitution. This Court did not discuss this constitutional argument in its opinion.

The constitutional discussion in the *Redding I* opinion focused entirely on defendants' argument that the statutorily required disclosure of personally identifiable salary information "constitutes a violation of [the employees'] constitutionally protected right of privacy, which can only be violated after a finding by the court [not present in this case] that the state interest to be served outweighs the individuals' rights" (Brief of Appellant, p. 11). Plaintiff conceded that the constitutional "right to know" was subject to being overridden by "another person's constitutionally protected right of privacy" (Brief of Respondent, p. 7). Understandably, in view of that concession, the Court focused its constitutional discussion on the balance between the "right of the public to know what goes on in its public institutions," 606 P.2d at 1195 (implemented in this case by the statutory command of disclosure), and the defendants' claim that this would violate the employees' constitutional right of privacy. After weighing these two interests and considering the numerous cases cited in the briefs on this issue, this Court concluded that the statutory right of the public "to have and to publish the information as to the salaries paid to employees of the college, outweighs considerations as to the right of privacy of the employees, or of the institution to carry on its operations in secret." 606 P.2d at 1196–97.

## II. THE NEW LEGISLATION

After the decree of the district court (but before the action of this Court) in *Redding I,* the Legislature enacted the Publication of Higher Education Salary Data Act of 1979, U.C.A., 1953, § 53–48a–1, *et seq.,* which is at issue in this case. By this action, the Legislature weighed the competing interests of disclosure and privacy, and

curtailed the statutory command of disclosure this Court implemented in *Redding I.* The purpose of the Act and the pertinent legislative findings are set out in the first section:

> The legislature finds and determines that the citizens of this state have a legitimate interest in being informed as to the level of salaries paid to administrators, faculty members, and other employees of institutions of higher education. It also finds and determines, however, that those employees have a right to reasonable privacy with respect to their personal affairs, including their individual salaries. It further finds and determines that specific procedures should be provided by law to implement the public's right to be so informed, while safeguarding to a reasonable degree the privacy of the individual employees, and preventing the imposition of unnecessary and burdensome administrative costs upon such institutions in responding to requests for salary information.

U.C.A., 1953, § 53–48a–1. Section 53–48a–3 requires that each institution file "a complete report of summarized salary data" each year with the State Board of Regents. Under § 53–48a–4, these reports are open for public inspection and copying.

 The disputed provisions of the Act on the content of the public report and on the salary data that should not be disclosed are as follows:

> Each institution shall prescribe the format for reporting data and for the classification of positions and average salaries, subject to the guidelines prescribed by the board. No classification of positions may include more than 5% of the full-time positions of that institution on the reporting date or less than ten such positions. When average salary information is supplied for any classification, the highest and lowest gross salary payable to positions included in that classification, and the total number of positions included therein, shall be specified.

U.C.A., 1953, 53–48a–3(2).

> Except as provided by this act, personally identifiable salary data relating to employees constitutes private information within the meaning of, and shall be subject to disclosure to the extent provided in, the Utah Information Practices Act [63–50–1 to 63–50–10].

U.C.A., 1953, § 53–48a–5. This 1979 reclassification of personally identifiable salary data for higher education as "private information" mandated its confidentiality, since the Utah Information Practices Act, which governed the extent of disclosure of government data, provided that private data was "available only to the appropriate agencies" for specified uses. U.C.A., 1953, § 63–50–3(7). This new statutory direction of confidentiality is still in effect.[1]

As noted above, this Court's decision in *Redding I* was expressly based on evidence that defendants had refused to provide any salary information on college employees, and on the statutory law in effect at the time the district court entered its decree. However, by the time defendants received that ruling they were already subject to the Publication of Higher Education Salary Data Act of 1979, which mandated confidentiality for personally identifiable salaries but required disclosure of average and high and low salaries in various categories. When defendants followed the new legislation, refusing plaintiff access to personally

---

1. The purposes of the Information Practices Act were to safeguard the interests of persons on whom information was collected and stored, and to allow the state "to exercise its proper powers." U.C.A., 1953, § 63–50–2. This Act has since been consolidated with and repealed by the Archives and Records Service and Information Practices Act, Laws 1979, ch. 223, codified in U.C.A., 1953, § 63–2–59, et seq., under which, as in the predecessor legislation, "private data" is "available only to the appropriate agencies" for specified uses. The State archivist and records administrator, who has been made a defendant in this suit, is the custodian of the data treated in this legislation.

We have considered and reject plaintiff's argument that this repeal and reenactment had the effect of giving plaintiff a statutory right of access to the salary information at issue here. No such direction or intent is evident in the legislative action.

identifiable salary data, plaintiff brought this second suit, enlarging his disclosure request to cover all employees of the Utah System of Higher Education. The constitutionality of the 1979 legislation is the sole issue on this appeal.

### III. DISCLOSURE VS. PRIVACY

It is well to begin by contrasting this case with a multitude of other cases that have concerned the conflict between disclosure and privacy. This is not a case like *Redding I* or the authorities it discussed, where a statutory command of disclosure is resisted on the basis of an asserted constitutional right of privacy. Where a public agency has a legitimate interest in the outside income, business connections, or personal assets and liabilities of its employees or those it licenses for special privileges, and where a statute or regulation compels the disclosure of such financial information, courts have uniformly overruled constitutional privacy defenses and compelled disclosure to the public agency.[2] These are the authorities relied on in *Redding I*, 606 P.2d at 1196, esp. n. 11. That case and others have even overruled the asserted privacy defense when the required statutory disclosure included personally identifiable salaries paid by the public agency and where disclosure was to the public rather than merely to the agency.[3] In each of these groups of authorities, the statutory command of disclosure has been given primacy over the asserted constitutional right of privacy.

In contrast, instead of a contest between statutory disclosure and constitutional privacy, as in *Redding I*, this case involves a contest between statutory privacy and constitutional right-to-know. Here, the Legislature has required the disclosure of general salary data by categories, including averages and high-low salaries, but has specifically provided that personally identifiable salary information shall not be made public. Legislative action has given recognition and protection to the privacy rights of employees and to management needs for confidentiality in higher education. Consequently, this is a case where the proponent of disclosure is not supported by a legislative requirement of disclosure, as in *Redding I*, but must instead assert the unconstitutionality of legislation weighing the respective interests of disclosure and privacy and specifying privacy for personally identifiable salary information.

### IV. THE CONSTITUTIONAL RIGHT OF ACCESS

At the outset, we deem it significant that plaintiff has not been able to cite a single case in direct support of his argument that legislation like the Publication of Higher Education Salary Data Act, U.C.A., 1953, § 53–48a–1, *et seq.*, is unconstitutional. Every case where personally identifiable salary information was required to be made public was based on a statutory direction to that effect or upon the absence of any specific statutory direction on the subject. In no case of which we are aware has a statute specifying the nondisclosure of personally identifiable salary information been overturned on the basis that the state or federal Constitution mandated disclosure. Against that background, plaintiff relies on a constitutional right of access.

Plaintiff asks this Court to "recognize a constitutional rule of law to the effect that no state agency may deny the public's right of access to information regarding the gross salaries paid to public employees." He con-

---

**2.** *O'Brien v. DiGrazia*, 544 F.2d 543 (1st Cir. 1976); *County of Nevada v. MacMillen*, 11 Cal.3d 662, 114 Cal.Rptr. 345, 522 P.2d 1345 (1974); *Illinois State Employees Ass'n v. Walker*, 57 Ill.2d 512, 315 N.E.2d 9 (1974); *Stein v. Howlett*, 52 Ill.2d 570, 289 N.E.2d 409 (1972); *Lehrhaupt v. Flynn*, 140 N.J.Super. 250, 356 A.2d 35 (1976); *Apodaca v. Montes*, Tex.Civ. App., 606 S.W.2d 734 (1980); *Fritz v. Gorton*, 83 Wash.2d 275, 517 P.2d 911 (1974); *In Re Kading*, 70 Wis.2d 508, 235 N.W.2d 409 (1976).

**3.** *Penokie v. Michigan Technological University*, 93 Mich.App. 650, 287 N.W.2d 304 (1979); *Mans v. Lebanon School Board,* 112 N.H. 160, 290 A.2d 866 (1972); *Doolan v. Board of Coop. Ed. Services*, 48 N.Y.2d 341, 422 N.Y.S.2d 927, 398 N.E.2d 533 (1979). Compare *Welch v. Seery*, 138 Vt. 126, 411 A.2d 1351 (1980) (Right to Know Law held inapplicable to type of financial data sought to be disclosed).

tends that this constitutional requirement can be found in Article I, Section 15 of the Utah Constitution, which provides that "No law shall be passed to abridge or restrain the freedom of speech or of the press." Plaintiff also refers to the "Federal Constitution," presumably to the First Amendment. Plaintiff argues that these constitutional protections guarantee members of the general public, as speakers or publishers, the right to inform others, which must imply a "right to gather information" so that members of the public can "be informed before they inform others." This amounts to an argument that the constitutional right to free expression necessarily includes a public right of access to official information about the operations of government. Plaintiff's argument is supported by the undeniable fact that information about government operations is essential to responsible citizenship in a democratic society.

A few decades ago, the assertion of a constitutional right of access to confidential government documents would have been deemed entirely without merit. Although it has been said that our courts have recognized "a general right to inspect and copy public records and documents,"[4] even as to public papers the right is not absolute, and as to the private papers of public agencies it has been nonexistent. Traditionally, statutes forbidding the disclosure of confidential government information have not been seriously questioned or opposed as to their constitutionality.[5]

◼ The absence of an unqualified constitutional right of access to government documents, papers, and actions is also evident in the long-standing recognition of the right of courts in appropriate cases to limit public access to their records and even to their proceedings. We have recently had occasion to affirm our district court's right to exclude the public from a portion of a criminal trial in a rare circumstance, *State v. Harding*, 635 P.2d 33 (1981), and to approve the judicial measures necessary to preserve the secrecy required during a criminal investigation before a grand jury or a prosecutor exercising similar statutory powers. U.C.A., 1953, § 77–22–2(3); *KUTV, Inc. v. Conder*, 635 P.2d 412 (1981). In recent decisions, other state courts have sustained the constitutionality of state laws reinforcing the confidentiality of selected judicial proceedings and records. *C. v. C.*, Del., 320 A.2d 717, 84 A.L.R.3d 581 (with anno.) (1974); *Stephens v. Van Arsdale*, 227 Kan. 676, 608 P.2d 972 (1980). From these decisions, it is apparent that the public has no absolute constitutional right to immediate access to everything its government officials are doing or everything their records contain. And it is well settled by numerous United States Supreme Court decisions that the First Amendment to the United States Constitution grants the press no special right of access to information not available to the public generally. *Houchins v. KQED, Inc.*, 438 U.S. 1, 98 S.Ct. 2588, 57 L.Ed.2d 553 (1978); *Nixon v. Warner Communications, Inc.*, 435 U.S. 589, 98 S.Ct. 1306, 55 L.Ed.2d 570 (1978); *Saxbe v. Washington Post Co.*, 417 U.S. 843, 94 S.Ct. 2811, 41 L.Ed.2d 514 (1974); *Pell v. Procunier*, 417 U.S. 817, 94 S.Ct. 2800, 41 L.Ed.2d 495 (1974); *Branzburg v. Hayes*, 408 U.S. 665, 92 S.Ct. 2646, 33 L.Ed.2d 626 (1972).

Traditionally, the free speech and free press provisions of the First Amendment to the United States Constitution and comparable provisions in state constitutions have not been seen as providing significant constitutional support for compelling government disclosure. Thus, in *Zemel v. Rusk*, 381 U.S. 1, 85 S.Ct. 1271, 14 L.Ed.2d 179 (1965), which affirmed the Secretary of State's refusal to approve citizens' travel to Cuba, the Supreme Court, speaking through Chief Justice Warren, declared that "the right to speak and publish does not carry with it the unrestrained right to gather information." *Id.* at 17, 85 S.Ct. at 1281. Accord, *United Press Association v. Valente*, 308 N.Y. 71, 123 N.E.2d 777 (1954);

---

**4.** *Nixon v. Warner Communications, Inc.*, 435 U.S. 589, 597, 98 S.Ct. 1306, 1311, 55 L.Ed.2d 570 (1978).

**5.** Anno. 165 A.L.R. 1302 (1946).

*Tribune Review Publishing Co. v. Thomas*, 254 F.2d 883 (3d Cir. 1958); *McMullan v. Wohlgemuth*, 453 Pa. 147, 308 A.2d 888 (1973); Comment, "The Rights of the Public and the Press to Gather Information," 87 *Harv.L.Rev.* 1505, 1512–13 (1974).

In *Branzburg v. Hayes*, 408 U.S. 665, 92 S.Ct. 2646, 33 L.Ed.2d 626 (1972), which required reporters to disclose the identity of their confidential sources to a grand jury, the United States Supreme Court, in an important dictum, acknowledged for the first time that "news gathering is not without its First Amendment protections . . . ." *Id.* at 707, 92 S.Ct. at 2669. In *Saxbe v. The Washington Post Co.*, 417 U.S. 843, 94 S.Ct. 2811, 41 L.Ed.2d 514 (1974), and *Pell v. Procunier*, 417 U.S. 817, 94 S.Ct. 2800, 41 L.Ed.2d 495 (1974), the Court held that whatever First Amendment protection was accorded the news-gathering activity of a free press, it did not give reporters a constitutional right to interview prison inmates—even about issues of public interest—contrary to an absolute prohibition in a prison regulation. Dissenting for himself and two others, Justice Powell articulated the basis for a First Amendment press privilege that could override such a regulation:

> But to my mind it is equally impermissible to conclude that no governmental inhibition of press access to newsworthy information warrants constitutional scrutiny. At some point official restraints on access to news sources, even though not directed solely at the press, may so undermine the function of the First Amendment that it is both appropriate and necessary to require the government to justify such regulations in terms more compelling than discretionary authority and administrative convenience.

417 U.S. at 860, 94 S.Ct. at 2819.

The majority position that the First Amendment provided no right of access to government information was restated in the prevailing opinions in *Houchins v. KQED, Inc.*, 438 U.S. 1, 98 S.Ct. 2588, 57 L.Ed.2d 553 (1978), and *Gannett Co. v. DePasquale*, 443 U.S. 368, 99 S.Ct. 2898, 61 L.Ed.2d 608 (1979), but in each case there

are signs that the majority was weakening on the proposition. In the *Gannett* case, for example, the five-justice majority stated that it "need not decide" whether there was a constitutional right of access, noting that "the putative right was given all appropriate deference" by the trial judge, and that any denial of access on the facts of that case (transcript of a suppression hearing) "was not absolute but only temporary." *Id.* at 392–93, 99 S.Ct. at 2912.

In a contemporaneous holding that a state statute prohibiting corporate expenditures to influence voters on public policy issues violated First Amendment rights, the Supreme Court declared that "the First Amendment goes beyond protection of the press and the self-expression of individuals to prohibit government from limiting the stock of information from which members of the public may draw." *First National Bank of Boston v. Bellotti*, 435 U.S. 765, 783, 98 S.Ct. 1407, 1419, 55 L.Ed.2d 707 (1978).

The most recent decision in this line of authorities is *Richmond Newspapers, Inc. v. Commonwealth of Virginia*, 448 U.S. 555, 100 S.Ct. 2814, 65 L.Ed.2d 973 (1980), where the Supreme Court, with only one justice dissenting, held that a state court could not exclude members of the public, including the petitioning newspapers, from a state criminal trial. Although there was no opinion for the majority in this case, a common element in the reasoning of all seven of the justices in the majority (plus Justice Powell, who took no part in this case but had expressed his views in the dissent quoted above) was that the First Amendment gives the public a right of access to gather information about a criminal trial. (The decision was in no way based on the criminal defendant's Sixth Amendment right to a public trial.) Three of these justices explicitly phrased that rationale broadly, in terms of a right to gather information to aid debate on public issues or in terms of a right of "access to information about the operation of their government." 448 U.S. at 584, 586–589, 100 S.Ct. at 2831 and 2833–34. (Justice Powell's *Saxbe* dissent was to the

same effect, 417 U.S. at 860, 94 S.Ct. at 2819.) One additional justice described the First Amendment right partly in terms of the need for public access to information about the conduct of public servants. 448 U.S. at 603, 100 S.Ct. at 2842.

Because the seven opinions in *Richmond Newspapers* are so badly fragmented on the precise rationale of the Court's holding, it is currently impossible to predict the extent to which the First Amendment right recognized in that case is applicable to other agencies of state government and to other types of information.

Some would read *Richmond Newspapers* as a recognition by a majority of the United States Supreme Court that the freedoms of speech and press guarantee some public right of access to information on the proceedings and records of all state agencies to aid citizen participation in a democratic government.[6] Under this interpretation, the proponent of any restrictions on the constitutional right of access—such as the non-disclosure at issue in this case—would have the burden of demonstrating the appropriateness of the restriction under the test of "strict scrutiny," "compelling state interest," or other test appropriate in the circumstances.

In contrast, others have urged that the *Richmond Newspapers* case be applied only to criminal trials or (somewhat more broadly) that it be confined to official proceedings traditionally open to the public, on the basis that the broadest reading of the case would inevitably entangle the courts in the difficult and time-consuming task of identifying on a case-by-case basis which kinds of government information fall within the public's constitutional right of access and which do not.[7]

### V. THE CONSTITUTIONALITY OF THE NONDISCLOSURE PROVISION

■ The decision of this case does not require us to adopt a definitive interpretation of the puzzling *Richmond Newspapers* case or to delimit the outlines of the new First Amendment right of access that seems to be emerging from this line of authority. All of the opinions in *Richmond Newspapers* stress that the right of access—however it is to be defined—is not absolute. Access to official information can be denied upon an appropriate showing of necessity. Otherwise, a government agency could not have even a limited privilege of confidentiality to accomplish its work, and a government official or employee would be vulnerable to significant losses of privacy in his or her personal life.

■ Even assuming the broadest definition of the First Amendment right applied in *Richmond Newspapers* and the most stringent burden of proof incident thereto, we conclude that the challenged statute does not offend the right. On the record before us, the limited restrictions on public access to information prescribed in the Publication of Higher Education Salary Data Act have been shown to be justified by a compelling state interest, *First National Bank of Boston v. Bellotti*, 435 U.S. 765, 786, 98 S.Ct. 1407, 1421, 55 L.Ed.2d 707 (1978); *Elrod v. Burns*, 427 U.S. 347, 362, 96 S.Ct. 2673, 2684, 49 L.Ed.2d 547 (1976); *NAACP v. Button*, 371 U.S. 415, 438, 83 S.Ct. 328, 340, 9 L.Ed.2d 405 (1963), which cannot be implemented by less restrictive means. *Village of Schaumburg v. Citizens for a Better Environment*, 444 U.S. 620, 637, 100 S.Ct. 826, 838, 63 L.Ed.2d 73 (1980); *United States v. O'Brien*, 391 U.S. 367, 377,

---

6. E.g., "The Supreme Court, 1979 Term," 94 *Harv.L.Rev.* 77, 149–59 (1980); Comment, "Public Trials and a First Amendment Right of Access: A Presumption of Openness, 60 *Neb.L. Rev.* 168, 170, 197–99 (1981). This is the position advocated before the *Richmond Newspapers* decision in A. Lewis, "Keynote Address: The Right to Scrutinize Government: Toward a First Amendment Theory of Accountability," 34 *U. of Miami L.Rev.* 793 (1980).

7. E.g., Archibald Cox, "Freedom of Expression in the Burger Court," 94 *Harv.L.Rev.* 1, 19–26 (1980); Note, "Richmond Newspapers, Inc. v. Virginia: A Demarcation of Access," 34 *U. of Miami L.Rev.* 937, 950–55 (1980); Note, "Constitutional Law, [etc.]," 26 *Villanova L.Rev.* 183, 203 (1980–81).

88 S.Ct. 1673, 1679, 20 L.Ed.2d 672 (1968); *Shelton v. Tucker*, 364 U.S. 479, 488, 81 S.Ct. 247, 252, 5 L.Ed.2d 231 (1960); *In re the Matter of Nelda Boyer*, 636 P.2d 1085 (1981). Article I, § 15 of the Utah Constitution does not require more than this.

The closest precedent of which we are aware is *McMullan v. Wohlgemuth*, 453 Pa. 147, 308 A.2d 888 (1973), where the Pennsylvania Supreme Court refused to order disclosure of the names and addresses and amounts paid to public assistance recipients, even though the petitioning newspaper contended that this disclosure was required by the state Right to Know Act and by state and federal constitutional rights of access to gather news. Even assuming that there was a constitutional right to gather news from such public sources, the court held that the right was not absolute and would not prevail over the specific statutory prohibition on disclosure of this particular private information. The Court held:

> The statutory ban against disclosing the names of public assistance recipients is a clear recognition and directive by the Legislature that the privacy of the recipient is a fundamental need worthy of protection. This Court is bound to give great deference to this sound legislative judgment. The statutory limitation imposed on appellees' asserted First Amendment right to compel the disclosure of those receiving assistance is no greater than necessary to protect the substantial governmental and individual interests involved. [Authorities cited.] Accordingly, in the face of this legislative directive, appellees cannot prevail.

*Id.* at 897–98.

The considerations cited in that precedent fit all the circumstances of this case. Section 1 of the Publication of Higher Education Salary Data Act, quoted earlier, contains admirably sensitive and appropriate legislative findings on the importance of both disclosure and privacy in the matter of public access to salaries paid to public employees in higher education. The substantial public interest in knowing the general levels of salaries paid in different areas of this public employment is fully recognized, as are the public's interest in avoiding burdensome administration and the employee's interest in the privacy of his or her individual salary. In resolving a controversy such as this, those legislative findings are entitled to great weight. The Act implements those findings with due concern for each of the important interests involved.

Significant support for the legislative distinction between the confidentiality of higher education salaries and the disclosure of all other state salaries appears in the record in the sworn statements of numerous respected educators who explain the special needs for confidentiality for the personally identifiable salary information of employees in higher education. The uniqueness of the higher education structure of authority and traditions of collegiality cited by these educators have even been recognized and relied on in the reasoning of the United States Supreme Court's decision in *N. L. R. B. v. Yeshiva University*, 444 U.S. 672, 100 S.Ct. 856, 63 L.Ed.2d 115 (1980).

We conclude that the legislative findings and directions and the evidence submitted in this case constitute an adequate showing of a compelling state interest in the confidentiality of personally identifiable salary information of employees in higher education and of the fact that this interest cannot be implemented by less restrictive means. Consequently, even assuming (without deciding) that there is a constitutional right of access to information on the salaries paid to public employees, we conclude that the withholding of personally identifiable salary information as prescribed in the Publication of Higher Education Salary Data Act of 1979, U.C.A., 1953, § 53–48a–1, *et seq.*, does not violate that right. The statute is therefore constitutional.

The district court's decree granting defendants' motion for summary judgment is affirmed. Costs to respondents.

HALL, C. J., and STEWART and HOWE, JJ., concur.

MAUGHAN, J., heard the arguments, but died before the opinion was filed.